# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-00763-COA

**STEVEN BROOKS RUSSELL A/K/A STEVE RUSSELL**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/20/2018 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/02/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.    Steven Brooks Russell appeals his conviction of embezzlement and the resulting sentence. On appeal, Russell asserts the following assignments of error: (1) the evidence was insufficient to support his conviction; (2) the jury's verdict was contrary to the weight of the evidence; (3) the Rankin County Circuit Court erred in allowing the State to introduce unauthenticated business records and in allowing hearsay testimony about those records; and (4) his sentence is illegal.

¶2.    After our review, we affirm Russell's conviction and sentence.

**FACTS**

¶3. This appeal involves fraudulent truck-repair orders that Russell created while he was an employee of KLLM Transport Services (KLLM), a trucking company. Russell was accused of creating the fraudulent repair orders, generating electronic checks to pay for the repairs, and then cashing these checks and pocketing the money. As a result of these actions, Russell was indicted for embezzlement in excess of $25,000.

¶4. The record reflects the owners of KLLM also own another trucking company named Frozen Food Express (FFE). According to the record, KLLM handles the repairs and maintenance of both KLLM's and FFE's trucks and trailers.[1] After conducting an audit, Russell's supervisor at KLLM/FFE discovered that Russell had been creating false repair orders for KLLM/FFE trucks and then generating electronic payments known as "Comcheks" to pay for the false repairs. The supervisor alleged that Russell then cashed the Comcheks himself and pocketed the money.

¶5. Russell worked in the road service department at KLLM Transport Services for approximately five years until his employment was terminated. Russell's responsibilities

---

[1] The record reflects KLLM was originally listed as the victim in the indictment. The indictment was later amended by the State to list FFE as the victim. The State's motion to amend the indictment reflects that "when the company's auditors provided a spreadsheet outlining their losses the victim was identified as FFE (a different trucking company with common owners and common offices with KLLM)." The trial court granted the motion to amend the indictment during a bench hearing on the motion, but no written order appears in the record. During Russell's trial, the companies were referred to interchangeably; therefore, for the purposes of this appeal, we will refer to the companies as "KLLM/FFE."

included compiling lists of long-term trucks "down" for an extended period of time, calling vendors to make repairs on the trucks, and making sure that the trucks were repaired in a timely manner. James Jones, Russell's supervisor in the service department, testified that when a truck breaks down on the road, the truck driver will communicate with KLLM and speak to an employee in the road service department regarding the problem with the truck. Jones stated that KLLM would then try to find a vendor close to the driver to go out and make repairs to the truck and get the truck back on the road. Jones testified that the electronic file containing the repair log on a particular truck for a particular breakdown is known as a "job."

¶6.    During the three-year time frame set forth in Russell's indictment (January 1, 2014, through February 28, 2017), the KLLM/FFE service department used Comdata Corporation (Comdata) to electronically make payments to vendors and repair shops nationwide. When a KLLM/FFE repair was completed, the service department arranged for Comdata to make a payment to the vendor for the repairs. This involved the issuance of a unique Comdata payee authorization code for that payment to be made either electronically by Comdata or by way of a "Comchek."

¶7.    According to Jones, KLLM was switching from Comdata to a new electronic payment service called Electronic Funds Source LLC (EFS), and Jones's supervisor wanted him to identify any problems that KLLM was having with Comdata and Comcheks before they switched to EFS. Jones testified his supervisor instructed Jones to perform an audit of

3

KLLM's records. Jones explained that in the course of performing the audit, he discovered a pattern in the truck repair reports over a period of three months: numerous incidents of FFE trucks needing repairs for coolant leaks or air leaks, and the repair amounts were all under $500. Jones stated that the reports reflected that the same individual, Russell, opened and closed out these jobs. As a result of these jobs, express codes were used to issue Comcheks. Jones testified that the report revealed that all of the Comcheks were later cashed at the Pilot Truck Stop on Gallatin Street in Jackson.[2]

¶8. Jones testified that he found this discovery unusual because "in my department[,] there are no patterns" due to the "many different pieces of equipment" involved. Jones also explained that the same individual in the service department would not both open and close a "job"; rather, the job would be "routinely" opened by one individual and later closed by a different individual in the department. Jones further explained that the same individual would not enter jobs for the same truck and the same amount of money.

¶9. Jones testified that each employee in the service department had their own individual login identification and password for the software system used by KLLM for recording repairs on trucks. When an employee created or closed a job, that employee's initials would be recorded for that job. Jones testified that when he performed a search of Russell's log-on name and pulled up the jobs that Russell created, he discovered "hundreds" of incidents

---

[2] The business name is Pilot Travel Centers, Incorporated, but the briefs refer to this particular store as Pilot Truck Stop, so will also refer to the business as Pilot Truck Stop.

4

matching this particular pattern.

¶10.   Jones also testified as part of his job requirements, Jones would receive a daily report detailing the jobs that were opened that day, and he would review the report "to see what kind of activity was on the report, whose names was there, the amounts of the jobs that we would pay out."  Jones stated that he often did not scrutinize jobs amounting to $500 or lower; rather, he scrutinized the jobs that amounted to approximately $8,000 to $9,000 in repairs and maintenance.  Jones explained that due to the fact that whenever KLLM/FFE was the victim of fraud, "the scams that were perpetrated[] were generally in [the] category" of $8,000 to $9,000.  Jones testified that Russell was aware of Jones's practice of not closely scrutinizing jobs under $500.

¶11.   Jones stated that after he discovered this pattern, he watched Russell open a job on February 6, 2017, and then close out that same job two days later on February 8, 2017.  Jones stated that the job listed the vendor as "ABC Truck and Tire" in Fredericksburg, Virginia, and the payment method listed was an express code in the amount of $493.97.  Jones explained that he "knew that [Russell] was starting and closing this job to produce an express code that he himself would cash."  Jones testified that after discovering this information, he contacted his supervisor, Mike Bromhall.  Jones and Bromhall then called Lieutenant Lee Drake, the chief investigator of the criminal investigation division with the Richland Police Department, and informed him of the suspected actions by Russell.

¶12.   Lieutenant Drake testified that Bromhall contacted him regarding a potential theft of

5

KLLM/FFE funds by Russell. Lieutenant Drake stated that the following day, Bromhall contacted him again, this time to let him know that Russell had closed out a work order that day. When Russell left work for the day, Bromhall alerted Lieutenant Drake and provided him with a picture of Russell's truck and the tag number. Lieutenant Drake then drove to the Pilot Truck Stop on Gallatin Street. Lieutenant Drake testified that upon arriving at the truck stop, he saw Russell's truck. Lieutenant Drake entered the store and discovered Russell "at the Comchek counter cashing a check." Lieutenant Drake then began videoing Russell with his cellphone. The cellphone video was played for the jury. Lieutenant Drake explained that in the video, Russell was holding an EFS check,[3] and the cashier was counting out money.

¶13. Lieutenant Drake testified that he then followed Russell out of the store and stopped him. After identifying himself, Lieutenant Drake asked Russell what he was doing at the truck stop. Lieutenant Drake stated that Russell informed him that he was cashing a check for a vendor called "ABC something." Lieutenant Drake then proceeded to pat down Russell to check for weapons. In the course of performing the pat down, Lieutenant Drake retrieved $479.15[4] in United States currency from Russell's pocket as well as a Pilot receipt reflecting that a EFS check in the amount of $493.97 had been cashed. Lieutenant Drake also testified that Russell had "three EFS blank checks" in his hand. Lieutenant Drake testified that on the

---

[3] After switching from Comdata, KLLM/FFE issued EFS checks, instead of Comcheks, for repairs.

[4] The record reflects that Pilot Truck Stop charged a cash advance fee of $14.82 for cashing the EFS check. This explains the difference between the EFS check issued for the amount of $493.97 and the $479.15 in cash discovered in Russell's pocket.

6

back of Russell's receipt from cashing the EFS check, he found a sticky note containing an express code number, the initials for the EFS, the name of alleged vendor, ABC, and the amount of the check ($493.97).

¶14. Lieutenant Drake instructed Russell to come to the police department for questioning. Lieutenant Drake testified that during his videotaped interview with Russell, Russell informed him that he was at the truck stop cashing a Comchek for a driver, and the driver would provide Russell with a fee in return for cashing the Comchek. Lieutenant Drake eventually asked Russell "if we could agree he had not been completely honest with me about his story, and he said yes." According to Lieutenant Drake, Russell admitted that he was not cashing checks for other drivers and he lied because he did not want to get in trouble.

¶15. The State played Russell's confession video for the jury. In the video, Lieutenant Drake tells Russell, "I know you've been to [the Pilot Truck Stop on Gallatin Street] more than three or four times in the last month, I know this has been going on for quite some time." The video shows Russell nodding affirmatively as Lieutenant Drake spoke. Regarding the job opened on February 6, 2017, and closed on February 8, 2017, Lieutenant Drake told Russell that he knew Russell closed the job shortly after lunch that day, and that after the code was generated Russell then took the code to the Pilot Truck Stop and cashed the check. Russell told Lieutenant Drake that this was correct. Lieutenant Drake then asked Russell to tell him how Russell "started coming up with the idea to do the fraudulent work orders." Russell admitted to Lieutenant Drake that due to the volume of work orders that

7

came through KLLM/FFE, he thought he could get away with creating fraudulent work orders. Russell explained that "it just escalated from there." Russell also told Lieutenant Drake that his daughter needed eye surgery, and he wanted to "stay ahead" of the bills.

¶16. Russell was arrested and then indicted for embezzlement in excess of $25,000. Russell's indictment specifically charged him with embezzling United States currency that was the personal property of FFE between January 1, 2014, and February 28, 2017. The indictment set forth that the money at issue "had been entrusted to [Russell's] care by virtue of his office, position, place[,] or employment."

¶17. At trial, the jury also heard testimony from Marcie McDonald, the warranty manager for KLLM/FFE. McDonald testified that her job requirements involve handling the maintenance department's records. McDonald explained that Bromhall contacted her and asked her to gather reports on the road service department and the issued Comcheks to determine if "there could have been fraud going on." McDonald testified that she created a report of every repair order during the relevant time period set forth in Russell's indictment as well as the backing information for each repair order, which included the driver's logs and Comcheks. All of this information was entered into evidence as Exhibits S-18 and S-19.

¶18. Exhibits S-18 and S-19 consisted of 405 completed repair orders that Russell opened and closed in the service department. McDonald testified that each of those 405 instances had the following common characteristics: Russell was the employee who both opened and closed all of the jobs; the repair orders were placed on equipment that belonged to FFE, not

8

KLLM; all of the orders were for under $500; and all of the orders were paid with Comcheks that were cashed at the Pilot Truck Stop on Gallatin Street. McDonald explained that Exhibit S-16, which was admitted into evidence and also incorporated into Exhibits S-18 and S-19, consisted of the Comdata checks and receipts from the Pilot Truck Stop that she was able to pull off of the report for the Comcheks in question. McDonald testified that in Exhibit S-16, "several of the receipts have the name S. Russell or Steve Russell or Russell attached to it" and that "[s]everal of the paper Comcheks have Steve Russell's driver's license number, the city and state that he was living in at the time," as well as a signature. The State argued that this evidence showed that Russell himself cashed those particular Comcheks. At trial, Herbert Montgomery, the general manager for the Pilot Truck Stop on Gallatin Street, authenticated the Comcheks and receipts that were entered into evidence as Exhibit S-16. Montgomery confirmed that the images of the Comcheks and the Pilot Truck Stop receipts showing that the Comcheks were cashed are maintained by Pilot Truck Stop.

¶19.    McDonald testified that based on the information she obtained from her reports, she concluded that KLLM/FFE suffered a total loss of approximately $190,000. However, during cross-examination, McDonald admitted that "with the vast majority" of the 405 incidents, she had no proof that Russell himself cashed the Comchek for the repair.

¶20.    McDonald testified that she created a spreadsheet containing all of the data she gathered from the reports. This spreadsheet was marked for identification as Exhibit S12-ID. The trial court ruled that it would admit the spreadsheet into evidence if the State could lay

9

the proper foundation for admitting it. McDonald's spreadsheet lists the 405 repair orders and show a total payout by Comdata of $190,664.23. The spreadsheet also references Comdata invoices to KLLM/FFE for the amount paid plus an additional $0.85 Comdata charge for each payment, which amounts to a total of $191,007.63.[5]

¶21. Regarding the information McDonald used to compile the reports and spreadsheet, McDonald explained that she was not a Comdata employee, but she had authority under the contract between KLLM and Comdata to view, but not modify, reports of all Comcheks issued by KLLM employees.

¶22. At trial, five FFE drivers testified, and all denied reporting the specific repairs listed for their trucks on the report showing jobs opened and closed by Russell. The drivers also denied authorizing Russell to cash Comcheks for them in Jackson. The drivers testified that KLLM/FFE drivers were not involved in the payment of repairs to the vendors.

¶23. At the close of the State's case, the defense moved for a directed verdict, arguing that the State failed to prove that Russell converted KLLM/FFE's funds to his own use. The defense also claimed that the State failed to prove that the repairs listed on the reports containing the repair orders opened and closed by Russell did not take place. The defense also claimed that the State failed to prove that the vendors did not receive the money for those repairs. The defense acknowledged the testimony from the truck drivers stating that they did not report the alleged repairs that appeared on the report, but the defense claimed

---

[5] This is the restitution amount that the trial court ordered Russell to pay.

10

that other than this testimony, "there's been absolutely no evidence that these repairs didn't take place and the vendors weren't paid." As to Russell's confession to Lieutenant Drake that on February 8, 2017, he was cashing a Comchek at the Pilot Truck Stop, the defense argued "there's no testimony at all that the repair wasn't made, and that the vendor wasn't ultimately going to get that money or hadn't gotten it from the driver."

¶24. The State asserted, however, that it entered 149 Comcheks or receipts into evidence and that on 71 of those, Russell's name, signature, or his driver's license appears. The State acknowledged that the remaining Comcheks and receipts "just say[] 'mask,' and . . . [do not] list anything . . . about the individual cashing them."

¶25. After hearing arguments from the parties, the trial court denied the defense's motion. The trial court determined that "there has been a showing of at least $25,000 to meet that threshold consistent with the indictment." The trial court explained that "the evidence establishes that more than $25,000 worth of Comcheks for repairs were issued under the defendant's user ID, which he had to have a password to get in to do. After which all those Comcheks were cashed at the Pilot [Truck Stop] . . . on Gallatin Street, so I have a circumstance where I don't know that it's necessary to prove that the vendor didn't get the money, because the vendor wasn't ever supposed to get the money." The trial court also referenced the State's evidence showing that KLLM/FFE "frowned upon, and, in fact, almost never issued the Comchek to the driver after the driver paid for the services out of his pocket."

11

¶26.    The jury ultimately convicted Russell of embezzlement in excess of $25,000. The trial court then sentenced Russell to serve twenty years in the custody of the MDOC and to pay $191,007.63 in restitution, plus court costs.

¶27.    Russell filed a motion for judgment notwithstanding the verdict, a motion to vacate the judgment, and a motion for a new trial, which the trial court denied. Russell then filed his notice of appeal.

## DISCUSSION

### I.    Sufficiency of the Evidence

¶28.    Russell argues that the State failed to meet its burden of presenting sufficient evidence to support a conviction for embezzlement. Russell specifically asserts that the State failed to present evidence showing that the funds for which Russell was charged with embezzling belonged to KLLM/FFE, as charged in the indictment, and that the funds were entrusted to Russell. As a result, Russell argues that the State failed to prove that Russell converted any money entrusted to him that belonged to KLLM/FFE. Russell therefore maintains that the State did not prove the required element of "conversion of entrusted property" necessary for an embezzlement conviction. Russell does not claim that he did not commit a crime; rather, he argues that the State set forth evidence to support a charge of obtaining money by false pretense—not a charge of embezzlement.

¶29.    When reviewing a defendant's challenge to the sufficiency of the evidence, the Supreme Court has held that

we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime. We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did.

*Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017) (citations, emphasis, and internal quotation marks omitted). "When reviewing the sufficiency of the evidence, this Court looks at the [trial] court's ruling on the most recent occasion when such sufficiency was challenged." *Fleming v. State*, 732 So. 2d 172, 182 (¶34) (Miss. 1999).

¶30. We recognize that "[e]mbezzlement requires 'the wrongful appropriation or conversion of property where the original taking was lawful or with the consent of the owner.'" *Roberts v. State*, 960 So. 2d 529, 533 (¶15) (Miss. Ct. App. 2006) (quoting *Howington v. State*, 256 So. 2d 382, 383-84 (Miss. 1972)). Mississippi Code Annotated section 97-23-19 (Rev. 2014) provides that a person is guilty of embezzlement if he

> shall embezzle or fraudulently secrete, conceal, or convert to his own use, or make way with, or secrete with intent to embezzle or convert to his own use, any goods, rights in action, money, or other valuable security, effects, or property of any kind or description which shall have come or been entrusted to his care or possession by virtue of his office, position, place, or employment, either in mass or otherwise[.]

Russell was charged for embezzlement of an amount of $25,000 or more.

¶31. Russell's indictment specifically charges that he

> [did] willfully, unlawfully and feloniously embezzle or fraudulently secrete, conceal, or convert to his own use, or make way with or convert United States currency, either in mass or otherwise, valued in excess of Twenty-Five Thousand dollars ($25,000.00) or more the personal property of [KLLM/FFE], which had been entrusted to his care by virtue of his office, position, place or

13

employment, in violation of [section] 97-23-19 (1972)[.]

Accordingly, to prove embezzlement, the State had to provide evidence of the following: (1) KLLM/FFE owned the money valued at over $25,000; (2) the money was lawfully entrusted to Russell's care by virtue of his employment; and (3) Russell wrongfully converted the money to his own use.

¶32.    Russell argues that although his indictment charges him with embezzling funds belonging to KLLM/FFE, the evidence presented at trial failed to show that the funds at issue actually belonged to KLLM/FFE.  Russell claims that Pilot Truck Stop, and not KLLM/FFE, constituted the entity that transferred money based on the alleged false pretense.  Russell explains that Pilot Truck Stop cashed the drafts for which Comdata and EFS were the drawers.[6]  Russell also maintains that the State failed to prove that KLLM/FFE suffered any financial loss because the State presented no evidence to show that KLLM/FFE paid any of the invoices related to the repair orders.

¶33.    The State maintains that it met its burden of proving that the funds at issue belonged to KLLM/FFE and that these funds came into Russell's care or possession by virtue of his

---

    [6] In his brief, Russell also argues that Comdata and EFS are not banks, asserting that "[a] draft drawn on [a non-bank] payable through a bank is not a check because it is not drawn on a bank."  Russell therefore submits that the evidence fails to show that he converted any bank account funds belonging to KLLM/FFE and that KLLM/FFE was not a party to the subject drafts and had no privity to the drafts.  However, as the State argues, whether the funds were drafts or checks is not relevant because Russell was indicted for embezzling United States currency, either in mass or otherwise, and not for converting bank funds.

14

job at KLLM/FFE. The State also asserts that the evidence shows that KLLM/FFE paid all invoices that it received for the express checks issued on any repair orders. As stated above, Jones testified that KLLM paid for any repairs for FFE trucks, stating that "[KLLM] covers all the maintenance costs for [FFE]." When asked whose money was used to pay for the repairs to the FFE trucks on the jobs fraudulently opened and closed by Russell, Jones answered, "KLLM's money was used to pay," and he explained that the repair costs were eventually "charged back to FFE." Additionally, McDonald testified that when a Comchek is paid, a bill is sent by Comdata to KLLM/FFE. KLLM/FFE then pays the bill for the Comchek. McDonald explained that groups of Comcheks are electronically billed and paid at one time by KLLM.

¶34. The State also argues that while Russell did not have physical possession of the money, the evidence shows that Russell was lawfully entrusted with KLLM/FFE's money because Russell's job at KLLM/FFE provided him with the authority to create repair orders for trucks and issue express checks to pay the vendors for these repairs. At trial, Jones testified that because of Russell's position in the service department at KLLM/FFE, Russell had access to the funds used by KLLM/FFE to pay for truck repairs. The State also admitted Russell's confession video into evidence, which showed Russell admitting to Lieutenant Drake that he created the fraudulent repair orders, issued Comcheks to pay for the repairs, and then cashed the Comcheks, explaining that he needed the money to pay bills.

¶35. Russell acknowledges Jones's testimony that Russell had access to KLLM/FFE's

15

money, but Russell maintains that this testimony "was just [Jones's] mistaken belief and an incompetent legal opinion." Russell states that the evidence offered by the State only supported the inference that Russell used his position at KLLM/FFE to fraudulently induce Comdata and EFS to issue codes, which Russell then used to induce Pilot Truck Stop to print and cash the drafts. Russell maintains that this evidence does not prove embezzlement of funds that belong to KLLM/FFE.

¶36. In *Montgomery v. State*, 891 So. 2d 179, 187 (¶35) (Miss. 2004), a case with similar facts to the one before us, the supreme court affirmed Patsy Montgomery's conviction for embezzlement. Montgomery worked as an office manager and receptionist for Patterson Engineering & Development Inc. (PE). *Id*. at 182 (¶3). The owner of PE, Sam Patterson, authorized Montgomery, in her capacity as the office manager, to sign checks on behalf of the business as necessary, make deposits, and reconcile bank statements. *Id*. at (¶4). Patterson eventually discovered that Montgomery embezzled money from PE by writing duplicate payroll checks to herself, issuing a duplicate bonus check to herself, and depositing PE business checks into her personal bank account. *Id*. at (¶5). On appeal of her conviction, Montgomery argued that she should have been convicted of larceny instead of embezzlement. *Id*. at 187 (¶31). Montgomery asserted that she was never authorized to write the checks to herself, and therefore "her taking of them was illegal ab initio." *Id*. Montgomery maintained that as a result, she did not lawfully receive the checks and convert them to her own use; rather, she "took the checks with felonious intent at the time of the taking." *Id*. In its

16

analysis, the supreme court reiterated that "Montgomery was in charge of running the day-to-day operations at PE" and noted that "[n]ot only was she the office manager, record keeper and receptionist, she was entrusted to write checks on behalf of PE, make deposits for PE and reconcile the bank statements." *Id*. The supreme court ultimately found no merit to Montgomery's argument that she allegedly committed larceny, explaining that "[t]his is a classic case of embezzlement." *Id*. at (¶32).

¶37. In the present case, we find that the record contains sufficient evidence for a jury to find that Russell wrongfully converted KLLM/FFE's funds to his own use and that these funds were entrusted to Russell by the nature of his position at KLLM/FFE. We also find that the State presented sufficient evidence for a jury to find that KLLM paid the amount of the express checks that were issued as a result of Russell's false repair orders. After viewing the evidence in the light most favorable to the State, we find sufficient evidence existed for rational jurors to find Russell guilty of embezzlement.

¶38. Russell further argues that if this Court finds that sufficient evidence exists to support Russell's conviction for embezzlement, then this Court should find that the State only proved embezzlement under section 97-23-19(b), which is embezzlement for an amount between $1,000 and $5,000. In his appellate brief, Russell argues that the State only provided evidence for three instances of alleged fraudulent repair orders: (1) August 9, 2016, for $498.08; (2) August 16, 2016, for 489.05; and (3) the EFS draft of February 8, 2017, for $493.97. Russell maintains that the State only presented log records or driver testimony,

17

accompanied by copies of the negotiated drafts, for these three instances. Russell asserts that because these three instances only total $1,472.10, the State failed to prove that Russell embezzled an amount over $25,000 pursuant to section 97-23-19(d).

¶39. The State maintains, however, that it presented sufficient evidence for a jury to find that Russell embezzled more than $25,000. The State explains that the evidence and testimony at trial showed that a pattern existed regarding the jobs at issue that Russell opened and closed. As stated, McDonald testified she identified 405 jobs that were opened and closed by Russell on KLLM/FFE Transportation's equipment and possessed the following characteristics: the amount for each repair totaled under $500 each, and the repairs were paid for with Comcheks that were later cashed at the Pilot Truck Stop on Gallatin Street. McDonald testified that based on the information she obtained during her investigation, she calculated that KLLM/FFE suffered a loss of $190,000 due to Russell's embezzlement—well over $25,000. Russell also admitted to Lieutenant Drake that his actions of creating fraudulent repair orders and then cashing the Comcheks for the orders started out small, but eventually the amount of fraudulent repair orders he created escalated.

¶40. McDonald did admit that "with the vast majority" of the 405 incidents, she had no proof that Russell himself cashed the Comchek for the repair. The State argues, however, that although not all of the 405 repair orders contained a correlating Comchek, Pilot Truck Stop receipt, and driver's log in evidence, the jury could still reasonably infer that Russell authorized the Comcheks to be issued and cashed them based on the pattern of these jobs.

18

¶41.   Furthermore, the jury was instructed that if they found that the State failed to prove all of the elements necessary for embezzlement in an amount greater than $25,000, then they could consider the lesser charge of embezzlement in a lesser amount.  Based on its verdict, the jury found that sufficient evidence existed to prove embezzlement in an amount greater than $25,000.  Jury Instruction S-1A instructed the jury as follows:

> [I]f you believe from the evidence beyond a reasonable doubt that on or about or between the dates of January 1, 2014, and February 8, 2017, in Rankin County, that [Russell] did willfully, unlawfully, and feloniously embezzle . . . any United States Currency . . . valued in excess of twenty-five thousand dollars ($25,000.00) or more, the personal property of Frozen Food Express which had been entrusted to his care or possession by virtue of his office, position, place or employment, you shall find him guilty of embezzlement of twenty-five thousand dollars ($25,000.00) or more under the law.

Instruction S-1A then advised the jury that if they unanimously found that the State failed to prove all of the elements necessary for embezzlement in an amount greater than $25,000, the jury could then deliberate to consider the lesser charge of embezzlement in a lesser amount.  Instruction S-1A then stated that if the jury did find that the facts and law warranted a conviction of embezzlement in an amount greater than $25,000, the jury must "not be influenced by your power to find a lesser offense[,]" explaining that "[t]his provision is not designed to relieve you from the performance of an unpleasant duty.  It is included to prevent a failure of justice if the evidence fails to prove the original charge but does justify a verdict for the lesser crime."  As stated, "matters regarding the weight and credibility accorded the evidence are to be resolved by the jury." *Harvey v. State*, 875 So. 2d 1133, 1136 (¶18) (Miss. Ct. App. 2004).

19

¶42. The record further reflects that when denying the defense's motion for a directed verdict, the trial court found that sufficient evidence existed to "establish[] that more than $25,000 worth of Comcheks for repairs were issued under [Russell's] user ID, which he had to have a password to get in to do. After which all those Comcheks were cashed at the Pilot . . . on Gallatin Street[.]"

¶43. After our review, we find that the State presented sufficient evidence for the jury to find Russell guilty of embezzling an amount in excess of $25,000.

## II. Weight of the Evidence

¶44. Russell next argues that the trial court erred when it failed to grant his motion for a new trial on the ground that the verdict was against the overwhelming weight of the evidence. Russell cites to the factual arguments outlined in his brief regarding the sufficiency of the evidence, and he maintains that "there was no evidence of embezzlement" and that "the only conviction arguably supported by the weight of the evidence was for embezzlement under 97-23-19(b) for an amount between $1000 and $5000."

¶45. The supreme court has held that a defendant may challenge the weight of the evidence in a motion for a new trial. *Woods v. State*, 242 So. 3d 47, 59 (¶51) (Miss. 2018). The reviewing court must "weigh the evidence in the light most favorable to the verdict" and "only disturb[] a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017).

20

¶46. Based on the same evidence and testimony discussed above, we reject Russell's argument that the trial court erred when it denied his motion for a new trial. "The jury is charged with the responsibility of weighing and considering conflicting evidence, evaluating the credibility of witnesses, and determining whose testimony should be believed." *Wallace v. State*, 139 So. 3d 75, 78 (¶8) (Miss. Ct. App. 2013). Furthermore, "[f]actual disputes are properly resolved by a jury and do not mandate a new trial." *Ealey v. State*, 158 So. 3d 283, 293 (¶31) (Miss. 2015). Taking the evidence that supports the jury's verdict as true and reviewing it in the light most favorable to the verdict, we find that allowing Russell's guilty verdict to stand would not sanction an "unconscionable injustice." *Little*, 233 So. 3d at 292 (¶21). We therefore find no abuse of discretion in the trial court's denial of Russell's motion for a new trial.

### III.    Admission of Evidence

¶47. Russell next argues that the trial court erred in allowing the introduction of business records of Comdata and Pilot Truck Stop through the testimony of McDonald, a KLLM employee, without proper authentication of those records. Russell specifically takes issue with the following: (1) Exhibit S-12-ID, which is the spreadsheet McDonald compiled containing of all of the data she gathered when investigating KLLM/FFE's road service department and the Comcheks that were issued; (2) Exhibit S-16, which consisted of the Comcheks and receipts from the Pilot Truck Stop that McDonald pulled off the report for the Comcheks in question; and (3) McDonald's testimony related to those exhibits. Russell

21

asserts that this evidence was not shown to be admissible under Mississippi Rule of Evidence 902(11) or under Mississippi Rule of Evidence 803(6), and Russell therefore argues that McDonald's testimony was inadmissible hearsay. Russell also states that because Exhibit S-12-ID was marked for identification and not admitted into evidence, McDonald's testimony to the jury was based on unauthenticated documents. Russell claims that he was prejudiced by these unauthenticated documents and corresponding hearsay testimony regarding these documents because this evidence "provided an incompetent basis for the verdict." The record shows that Russell objected to these exhibits at trial and also objected to McDonald's testimony related to those exhibits.

¶48. On appeal, we review a trial court's admission or exclusion of evidence for an abuse of discretion. *Jackson v. State*, 245 So. 3d 433, 439 (¶32) (Miss. 2018). "For a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Id*. This Court will find that the admission of evidence "constitutes reversible error only where a party can show prejudice or harm." *Williams v. State*, 54 So. 3d 212, 216 (¶14) (Miss. 2011).

¶49. Rule 803(6) provides that records of a regularly conducted activity are excepted from the rule against hearsay if:

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C)     making the record was a regular practice of that activity;

(D)     all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11); and

(E)     the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

M.R.E. 803(6). Rule 902(11) provides that when records are certified by a certificate of the custodian (or another qualified witness) and meet the requirement under Rule 803(6), these records are self-authenticating and do not require extrinsic evidence of authenticity in order to be admitted into evidence.

¶50.    In support of his argument, Russell asserts that except for the repair orders and driver logs, McDonald based her testimony regarding the spreadsheet she compiled (Exhibit S-12-ID) on documents and information she obtained from Comdata and Pilot Truck Stop. Russell states that at trial a representative from Pilot Truck Stop authenticated only sixteen of the thirty-seven Comchek drafts and nine of the 124 Pilot receipts in Exhibit S-16. (As stated, the Comcheks and Pilot Truck Stops receipts in Exhibit S-16 were eventually incorporated into Exhibits S-18 and S-19.) Russell submits that no Comdata employee authenticated any of the Comdata documents that McDonald relied upon in creating her reports or spreadsheet. Russell argues that to be admissible, the additional documents gathered from Comdata and Pilot Truck Stop should have been authenticated by the testimony of the custodian or other qualified witness or self-authenticated pursuant to Rule 902(11). Russell claims that the

23

State failed to comply with Rules 803(6) and 902(11).

¶51.    The record reflects that during McDonald's testimony, the State moved to introduce McDonald's spreadsheet into evidence as Exhibit S-12-ID.  The defense objected, arguing that "just because she was given access to the Comdata system does not mean she has the authority to authenticate data from that system."  The defense also argued that the State did not make available the underlying data and documents that McDonald used to create her spreadsheet.

¶52.    In response, the State informed the trial court that the data McDonald used to compile the spreadsheet was not Comdata's data; rather, it was KLLM/FFE's data that was stored in the Comdata system.  No Comdata records were admitted into evidence.  The State reiterated that McDonald testified that the only data she could access in Comdata's system was KLLM/FFE's own data that was maintained in that system.  The trial court acknowledged that the spreadsheet contained KLLM/FFE's particular Comchek numbers and stated that "if her testimony is she was able to go into the [Comdata] system and get the KLLM[/]FFE numbers and that's how she compiled this summary, and the underlying data for each one of these rows are these documents, then I'm probably going to admit it."

¶53.    The record shows that McDonald's testimony was then proffered on the issue of authentication. McDonald explained that she obtained the information she used to create the spreadsheet (Exhibit S-12-ID) from data stored inside the Comdata website.  McDonald explained, however, that this particular data belonged to KLLM/FFE because "this is the

money that [KLLM/FFE is] responsible for." The trial court then stated, "I'm not bothered by the fact that she was granted access to the Comchek website to gather these documents, because she's stating she has the underlying material to support each column in each row. And I'm not bothered by the fact that she doesn't have the invoice backup documents, because that's not a KLLM/FFE document. That's a [Comdata] document. So unless I hear any other arguments, I'm inclined to let [the spreadsheet] into evidence." The defense again objected, arguing that they "[did] not believe she can authenticate all of the information on [the spreadsheet] . . . . We do not believe that we have been given the underlying documents for it, and in fact, [McDonald] has admitted that most of those underlying documents she's never had." The trial court ultimately ruled that because it found that the spreadsheet had sufficient data to support it, the trial court would admit the spreadsheet into evidence once a proper foundation for doing so was laid.

¶54.   Direct examination of McDonald continued, and the State asked McDonald about the information she used to compile the spreadsheet. The trial court instructed counsel for the State and defense to approach the bench. The trial court stated that although the defense had not objected to the testimony, the spreadsheet had not yet been entered into evidence. The trial court cautioned that "a witness doesn't need to talk about what's on a document that's not in evidence, because that's hearsay." The State then clarified that McDonald was testifying from information listed on a Comchek that was already admitted into evidence and not from information on the spreadsheet.

25

¶55. The State continued to question McDonald, and defense counsel later objected, arguing that McDonald was testifying about the data compiled in her spreadsheet even though the spreadsheet was not admitted into evidence. The trial court ruled that although "it appears that the State is not going to have S-12 introduced[;] . . . that doesn't prohibit [McDonald] from talking about basically what she did and the information she gathered in relation to that, and that's subject to cross examination." The trial court explained that it had already ruled that McDonald possessed the underlying documents to support the spreadsheet, which included copies of the Comcheks issued for the fraudulent repairs as well as the repair orders opened and closed by Russell, and "all [McDonald is] doing is testifying about the data that she gained to compile that report or that summary."

¶56. As to Exhibit S-16, the State argues that Montgomery, the general manager of Pilot Truck Stop, authenticated *all* of the Comcheks and receipts that comprised Exhibit S-16. The State maintains that Montgomery was a qualified witness to authenticate these documents. The State also argues that pursuant to Rule 803(6), records of a regularly conducted business activity are excepted from the rule against hearsay. The State therefore maintains that even if McDonald referenced data that was not in evidence at the time, any error was harmless because Exhibit S-16 was properly admitted later in the trial.

¶57. After our review, we cannot say that the trial court abused its discretion in allowing McDonald to testify about the data she used to compile her spreadsheet or in admitting the Comcheks and Pilot Truck Stop receipts into evidence. As the State argued, no Comdata

records were introduced into evidence. Instead, the record shows that the information and data McDonald obtained from Comdata's system belonged to KLLM/FFE, and McDonald is an employee of KLLM. We also find that the Comcheks and Pilot Truck Stop receipts contained in Exhibit S-16 were properly authenticated by Montgomery, and these records were therefore excepted from the rule against hearsay. Russell therefore failed to show that he was prejudiced by the trial court's admission of these documents or McDonald's testimony regarding these documents.

### IV. Illegal Sentence

¶58. Finally, Russell requests that if this Court does not reverse and render Russell's sentence, then this Court should perform a review of his sentence. As stated, the trial court sentenced Russell to serve twenty years in the custody of the MDOC and ordered him to pay $191,007.63 in restitution, plus court costs. Russell reiterates his arguments set forth above claiming that the evidence does not support a conviction of embezzlement for an amount exceeding $25,000 pursuant to section 97-23-19(d) and that "the maximum legal sentence is five years under section 97-23-19(b)." Russell also maintains that the trial court erred by ordering him to pay restitution to KLLM/FFE because the evidence failed to show that KLLM/FFE lost any money. Russell acknowledges that he did not raise the issue of an illegal sentence in the trial court, but he asserts that the right to be free from an illegal sentence is constitutionally fundamental and that, therefore, there is no procedural bar. *See Twillie v. State*, 892 So. 2d 187, 191 (¶12) (Miss. 2004); *Kennedy v. State*, 732 So. 2d 184,

27

186 (¶8) (Miss. 1999).

¶59.    On appeal, we review the terms of a sentence for an abuse of discretion. *Cummings v. State*, 58 So. 3d 715, 719 (¶19) (Miss. Ct. App. 2011). "Sentencing is within the complete discretion of the trial court and not subject to appellate review if it is within the limits prescribed by statute." *Id*. (quoting *Hoops v. State*, 681 So. 2d 521, 537 (Miss. 1996)). "Unless the sentence is grossly disproportionate or not within the statutory limits, we will not disturb the sentence on appeal." *Id*. (quoting *Owens v. State*, 17 So. 3d 628, 632 (¶8) (Miss. Ct. App. 2009)).

¶60.    As stated, Russell was convicted of embezzlement in excess of $25,000. Section 97-23-19(d) states that "[a]ny person guilty of embezzlement of . . . money . . . with a value of [$25,000] or more, shall be guilty of felony embezzlement, and, upon conviction thereof, shall be imprisoned in the [p]enitentiary not more than twenty (20) years, or fined not more than [$25,000], or both." Russell's sentence of twenty years in the custody of the MDOC is therefore within the limits prescribed by this statute.

¶61.    The record also shows that the trial court ordered Russell to pay $191,007.63 in restitution to KLLM/FFE. Mississippi Code Annotated section 99-37-3(1) (Rev. 2015) allows the trial court to order restitution, stating:

> When a person is convicted of criminal activities which have resulted in pecuniary damages, in addition to any other sentence it may impose, the court may order that the defendant make restitution to the victim; provided, however, that the justice court shall not order restitution in an amount exceeding Five Thousand Dollars ($5,000.00).

28

Section 99-37-1(a) states that for purposes of this section, "criminal activities" are defined as "any offense with respect to which the defendant is convicted or any other criminal conduct admitted by the defendant."

¶62. In *Cummings*, this Court held that while "Cummings's conviction of embezzlement gave the circuit judge the authority to order restitution in the full amount that was embezzled from the [victims], . . . there was no evidence presented to the circuit judge to support the amount of restitution imposed." *Cummings*, 58 So. 3d at 720 (¶27). This Court explained although the State announced that Cummings owed $34,411.04, "the State failed to present any evidence of this amount during sentencing." *Id*.

¶63. In the present case, Russell argues that the evidence presented at trial does not support the trial court's order of restitution in the amount of $191,007.63. According to Russell, "[s]imple math shows that the total claimed loss in Exhibits S-18 and S-19 is less than that—it is $187,181.76." Russell also asserts that "[l]ess than half of the repair orders in the so-called 'pattern' have any supporting documentation."

¶64. At trial, McDonald testified that based on the data in State's Exhibit S-18 and S-19, she concluded that KLLM/FFE suffered a total loss of approximately $190,000. McDonald's spreadsheet, which was marked for identification and not admitted into evidence, references Comdata invoices to KLLM/FFE for the amount paid plus an additional $0.85 Comdata charge for each payment. The spreadsheet lists the total amount owed to KLLM/FFE as a result of the fraudulent repair orders as $191,007.63, which is the amount the trial court

29

ordered Russell to pay in restitution.

¶65. After our review, we find no abuse of discretion by the trial court in sentencing Russell to serve twenty years in the custody of the MDOC and ordering him to pay $191,007.63 in restitution, plus court costs.

¶66. **AFFIRMED.**

**BARNES, C.J., GREENLEE AND LAWRENCE, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS AND McDONALD, JJ., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ. SMITH, J., NOT PARTICIPATING.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶67. Simply because the jury could find Russell embezzled over $25,000 does not automatically mean there was actual proof he embezzled $191,007.63. Because the State failed to present the required proof to establish restitution under our precedent, I respectfully dissent in part.

¶68. In a key case on restitution, we reversed and remanded restitution where the State failed to put on proof about how much money a convenience store clerk had allegedly stolen. *Cummings v. State*, 58 So. 3d 715, 721 (¶29) (Miss. Ct. App. 2011). The trial court ordered him to pay restitution in an amount combined from three convenience stores she had allegedly stolen from. *Id*. at 717 (¶¶2, 5). However, the State had only introduced evidence of missing deposits from *one* of the stores, not the other two. *Id*. at (¶2). During trial, the

30

State justified its patchwork proof by stating that "under the law[,] all we have to do is prove that more than $500 was missing on one occasion . . . so we're not here going through every deposit that was made or not made for a month, for three different stores, which is literally going to be hundreds." *Id*. at 719 (¶20).

¶69. But the State omitted such evidence to its own detriment. For we found on appeal that because "there was no evidence offered . . . to support any amount of restitution greater than the [amount] proved at trial[,] [i]t was error for the circuit judge to order" a greater amount of restitution without the correlating evidence to support it. *Id*. at 721 (¶29).

¶70. In fact, *Cummings* was built on our Supreme Court's decision. *Id*. at 720-21 (¶28) (citing *Powell v. State*, 536 So. 2d 13, 17 (Miss. 1988)). In that case, a trial court ordered restitution on behalf of a victim without requiring the State to present the medical bills upon which the restitution was based. *Powell*, 536 So. 2d at 15. In response, the Supreme Court firmly announced that "[i]t was error for the judge to use facts not in evidence to determine the amount of restitution." *Id*. at 17.

¶71. There is no distinction between *Cummings*, *Powell*, and this case. The same failures highlighted in *Cummings* and *Powell* are just as evident in Russell's case. KLLM's warranty manager, Marcie McDonald, was responsible for handling the department's records and reported each of Russell's repair orders. She unequivocally conceded at trial that she had no proof whatsoever he cashed checks for "the vast majority" of the 405 documented transactions. She could only testify that "several"—not all—"of the receipts [had] the name

S. Russell or Steve Russell or Russell attached to it." In fact, the State had only entered 149 receipts into evidence—and of those, only 71 displayed Russell's signature. The remaining receipts "just [said] 'mask' and . . . did not list anything . . . about the individual cashing them."

¶72. Therefore the trial court had insufficient proof to find that all 405 repair orders were subject to Russell's embezzlement scheme. Nonetheless, after conceding that the $191,007.63 was not a part of the jury's verdict, the court vaguely explained restitution would be ordered in that amount because "[the court] believed the State proved that up in their case." But the proof at trial was only sufficient to establish the $25,000 threshold for a felony embezzlement conviction—it was not enough to order a restitution award for $191,007.63.

¶73. There are many ways the proof could have been introduced. For instance, under Mississippi Rule of Evidence 1006, a party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." MRE 1006.

¶74. Yet there is no evidence to establish an award for the full $191,007.63. The trial court record completely lacked evidence that Russell in fact embezzled a sum beyond $25,000. In order to require Russell to pay back the restitution award, we need evidence to prove he committed the crime each time. We cannot merely guess that all of the transactions were fraudulent. The proof is simply missing.

¶75.    As in *Cummings*, there is proof enough in Russell's case to only order restitution of the amount proved at trial—no more.  For that reason, I respectfully dissent in part.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION.**